IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ZACHARIAH RICE                                        PLAINTIFF


        V.                        CIVIL NO. 10-5137


MICHAEL J. ASTRUE, Commissioner
Social Security Administration                        DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Zachariah Rice, brings this action pursuant to 42 U.S.C.§ 405(g), seeking judicial

review of a decision of the Social Security Administration (Commissioner) denying his claims for

a period of disability and disability insurance benefits (DIB) and supplemental security income (SSI)

benefits under the provisions of Title II and XVI of the Social Security Act (Act).  In this judicial

review, the Court must determine whether there is substantial evidence in the administrative record

to support the Commissioner's decision.  See 42 U.S.C.§ 405(g).

I.      **Procedural Background:**

Plaintiff protectively filed an application for DIB and SSI on April 18, 2008, alleging an

inability to work since March 5, 2008, due to deterioration of C5-C6 disc, neck and back pain, left

leg numbness, lesions on legs with swelling and infections, a ruptured achilles tendon, left hip

muscle spasms, pinched nerves, fatigue, insomnia, a high iron count, and white blood cells attacking

the body causing infection. (Tr. 130-134, 167).  For DIB purposes, Plaintiff maintains insured status

through March 31, 2012.  (Tr. 12, 175).  An administrative hearing was held before Administrative

Law Judge (ALJ) Penny M. Smith on October 28, 2009, at which the Plaintiff appeared with counsel

and testified. (Tr. 32-80).  Following the hearing, the case was reassigned to ALJ  Glenn A. Neel due

to the unavailability of ALJ Smith.  (Tr. 10).  After reviewing the record, ALJ Neel determined that an additional hearing was not required.  (Tr. 10).

By written decision dated February 26, 2010, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe.  (Tr. 12). Specifically, the ALJ found Plaintiff had the following severe impairments:  a back disorder (degenerative disc disease), a tendon disorder, and left leg neuropathy.  (Tr. 12).  However, the ALJ found that Plaintiff's depression, alcohol abuse, and cannabis abuse were not severe.  (Tr. 13).  After a review of all of the evidence, he determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4.  (Tr. 13).  The ALJ found that Plaintiff retained the residual functional capacity (RFC) to perform sedentary work, except as follows:

> The claimant cannot climb ladders, scaffolds, or ropes or engage in the sustained operation of motor vehicles as part of his work. The claimant cannot work overhead bilaterally. The claimant should not be exposed to unprotected heights, dangerous equipment/machinery, extreme wet conditions, or vibration. The claimant must avoid walking on uneven surfaces. The claimant can occasionally climb ramps or stairs, stoop, bend, crouch, crawl, kneel, or balance. Due to pain and side effects of medication, the claimant must work where instructions are simple and non-complex;  interpersonal contact with co-workers and the public is superficial and incidental to the work performed;  the complexity of tasks is learned by rote;  the work is routine and repetitive;  there are few variables;  little judgment is required;  and the supervision required is simple, direct, and concrete.

(Tr. 14).  With the help of a vocational expert (VE), the ALJ determined Plaintiff could not perform any of his past relevant work, but could perform substantial gainful activity in the national economy. (Tr. 17).  Specifically, the ALJ found that Plaintiff could perform work in the national economy as a production worker, an inspector, or an assembler.  (Tr. 18).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which

-2-

denied that request on May 14, 2010. (Tr. 1-3). Subsequently, Plaintiff filed this action. (Doc. 1). This case is before the undersigned pursuant to the consent of the parties. (Doc. 5). Both parties have filed appeal briefs, and the case is now ready for decision. (Docs. 10, 11).

## II.   Evidence Presented:

At an administrative hearing held before the ALJ on October 29, 2008, Plaintiff testified that he was born in 1976, and had obtained his GED. (Tr. 37). The record reflects Plaintiff's past relevant work consists of work as a construction laborer, a factory production worker, an auto-mechanic, a landscape laborer, a laundry worker, and a janitor. (Tr. 45-46, 155).

Plaintiff's medical records from prior to the relevant time period reflect the following. On March 25, 2007, Plaintiff entered the emergency room at the Washington Regional Medical Center, complaining of dental pain related to problems with a root canal. (Tr. 338). Dr. Rayetta Eaton-Willmoth noted poor dentition on the lower left first and second molars, and a red and swollen gum line. (Tr. 340). Plaintiff was diagnosed with dental pain, dental abscess, and elevated blood pressure secondary to pain. (Tr. 340). Plaintiff was discharged with prescriptions for ammoxicillin and lortab[1], and instructed that due to the infection he needed further evaluation at a dental clinic in three to seven days. (Tr. 342).

On April 21, 2007, Plaintiff entered the emergency room at the Washington Regional Medical Center, complaining of high blood pressure, shoulder pain, and neck pain. (Tr. 332). Plaintiff reported that his blood pressure had been elevated for the last three weeks, and that he was currently being treated at the Indian Hospital. (Tr. 332). Plaintiff further reported that he was going

---

[1]Lortab- trademark for combination preparations of hydrocodone bitartrate and acetaminophen. Dorland's Illustrated Medical Dictionary 1090 (31st ed. 2007).

-3-

to physical therapy for his right shoulder.  (Tr. 332).  Plaintiff was diagnosed with arthritis in his shoulder and benign hypertension.  (Tr. 336).  Plaintiff was instructed to watch his blood pressure, and follow-up with a local doctor.  (Tr. 336).  Plaintiff was given prescriptions for hydrochlorothiazide and lortab.  (Tr. 336).

On May 22, 2007, Plaintiff entered the emergency room at the Washington Regional Medical Center with copies of his medical records, seeking pain medications.  (Tr. 327).  Plaintiff complained of continued right shoulder and left sided neck pain.  (Tr. 329).  Plaintiff stated that his pain level was a ten out of ten.  (Tr. 327).  Plaintiff was diagnosed with an unspecified shoulder injury, and given a prescription of norco.[2] (Tr. 329).

On May 25, 2007, Plaintiff entered the emergency room at the Washington Regional Medical Center, with a laceration on his left heel.  (Tr. 322).  Plaintiff stated that he cut his foot while walking his dog.  (Tr. 322).  Dr. Robert A. Irwin noted that the laceration went deep in to Plaintiff's achilles tendon.  (Tr. 323-324).  Plaintiff received six nylon sutures to close the laceration.  (Tr. 324).  Plaintiff was given crutches, and instructed not to put any weight on his foot.  (Tr. 326).  Plaintiff was given prescriptions for cephalexin monohydrate and lortab.  (Tr. 326).

On June 17, 2007, Plaintiff entered the emergency at the Washington Regional Medical Center, complaining of left foot pain.  (Tr. 315).  Plaintiff reported that he had stepped in a hole, and his pain level was a nine out of ten.  (Tr. 315).  Plaintiff declined a splint or crutches.  (Tr. 315).  Plaintiff was diagnosed with a sprained ankle, instructed to follow up with the Ozark Orthopedic

---

[2]Norco- trademark for combination preparations of hydrocodone bitartrate and acetaminophen.  Dorland's Illustrated Medical Dictionary 1309 (31st ed. 2007).

-4-

clinic, and discharged with a prescription for ultram.[3]  (Tr. 321).

On July 22, 2007, Plaintiff entered the emergency room at the Washington Regional Medical Center, complaining of back pain.  (Tr. 310).  Plaintiff stated his pain level was a ten out of ten.  (Tr. 310).  He explained his pain was caused by the way he had to walk because of his achilles injury.  (Tr. 310).  Plaintiff was discharged with a diagnosis of a back strain.  (Tr. 314).  He was instructed to see an orthopedist if his heel pain did not improve, and given a prescription for lortab.  (Tr. 314).

On September 29, 2007, Plaintiff entered the emergency room at the Washington Regional Medical Center, complaining of severe back and heel pain, at a pain level of ten out of ten.  (Tr. 303).  After signing in, Plaintiff immediately walked to the cafeteria for food, and did not return for thirty minutes.  (Tr. 303).  Upon returning, Plaintiff demanded to be seen immediately due to his severe pain.  (Tr. 303).  Dr. David C. Beam noted that Plaintiff was able to walk without difficulty, and that Plaintiff's fingers were covered in paint.  (Tr. 303).  Plaintiff stated that he had chronic pain related to old injuries, which were exacerbated by the physically demanding job he had just started this month. (Tr. 303, 305).  Plaintiff was diagnosed with a cervical strain, a back strain, and a shoulder injury.  (Tr. 309).  Plaintiff was discharged with prescriptions for lortab and carisoprodol, a muscle relaxer.  (Tr. 309).

On October 16, 2007, Plaintiff entered the emergency room of the Washington Regional Medical Center, complaining that he was feeling weak and nauseated from a spider bite.  (Tr. 294).  Plaintiff stated that his pain level was a ten out of ten.  (Tr. 294).  Dr. Steven Spencer noted that Plaintiff had a large red area on his left thigh, with a small amount of clear fluid draining from it.

---

[3]Ultram- trademark for a preparation of tramadol hydrochloride.  Dorland's Illustrated Medical Dictionary 2027 (31st ed. 2007).

(Tr. 296).   Plaintiff was treated at the hospital with clindamycin phosphate,  promethazine hydrochloride novaplus, and adacel.  (Tr. 298).  Plaintiff was diagnosed with cellulitis, and instructed to return the next day for more antibiotics.  (Tr. 302).  Plaintiff was discharged with prescriptions for clindamycin hydroclride and lortab.  (Tr. 302).

On January 17, 2008, Plaintiff entered the emergency room of the Washington Regional Medical Center, complaining of anxiety.  (Tr. 289).  Plaintiff reported that his grandmother had passed away this week, and he felt anxious and could not sleep.  (Tr. 289).  Plaintiff was counseled by a doctor, diagnosed with a grief reaction, and discharged.  (Tr. 291).

On February 22, 2008, Plaintiff entered the emergency room of the Washington Regional Medical Center, complaining of chronic neck pain.  (Tr. 285). Plaintiff stated his pain was a level ten out of ten.  (Tr. 285).  Plaintiff explained that he did not care about all of the medicines, he just wanted to know what was wrong with his neck.  (Tr. 285).  Plaintiff reported that he was suffering from anxiety, which was not being treated.  (Tr. 285).  Plaintiff was given injections of depo-medrol and toradol.  (Tr. 287).  He was diagnosed with cervical radiculopathy[4], and discharged with a prescription for ativan.  (Tr. 288).

Between August 14, 2007, and April 23, 2008, Plaintiff received treatment from Dr. C.R. Magness at the Dickson Street Clinic on ten different occasions.  (Tr. 226-227, 235-236, 238-239). While most of Dr. Magness's handwritten notes are illegible, it appears Plaintiff sought treatment for pain related to old neck, back, and foot injuries, as well as, anxiety.  (Tr. 226-227, 235-236, 238-239).  Dr. Magness provided Plaintiff with prescriptions for celexa, hydrocodone, klonopin,

---

[4]Cervical radiculopathy- disease of the cervical nerve roots, often manifesting as neck or shoulder pain.  Dorland's Illustrated Medical Dictionary 1595 (31st ed. 2007).

tramadol, and methadone.  (Tr. 226-227, 235-236, 238-239).

The pertinent medical evidence from the relevant time period reflects the following.  On March 10, 2008, Plaintiff entered the emergency room at the Washington Regional Medical Center, with left leg numbness, back pain, and yellow blisters on his arms and legs.  (Tr. 259, 266).  Plaintiff reported that he had smoked a half a pack of cigarettes a day for the last two years.  (Tr. 267).  Plaintiff underwent a bilateral lower extremity duplex venous sonogram performed by Dr. Robert L. Morris.  (Tr. 232-233, 274).  The test results were normal, showing no thrombus, and phasic augmentalble flow throughout.  (Tr. 232-233, 274).  The next day, Plaintiff was formally admitted, and had x-rays taken of the paranasal sinuses and lumbosacral spine.  (Tr. 231, 266-273, 278).  Both images showed normal results.  (Tr. 231, 278).

On March 11, 2008, Plaintiff had an orthopedic consultation with Dr. Matthew J. Coker at the Washington Regional Medical Center.  (Tr. 263-265).  Dr. Coker noted that while Plaintiff denied IV drug use, he had marks on his right arm consistent with track marks.  (Tr. 264, 266).  Plaintiff explained that he was giving blood, but Dr. Coker noted that the multiple injection sites were more consistent with IV drug use.  (Tr. 264).  Dr. Coker noted that Plaintiff's blisters were unroofed, but had a bit of erythema[5] around them.  (Tr. 265).  Dr. Coker opined that Plaintiff might have an early cellulitis[6], but noted that there was no compartment syndrome or septic joints.  (Tr. 265).  He further noted that no abscesses were present during the clinical exam.  (Tr. 265).  Dr.

_____

[5]Erythema- redness of the skin produced by congestion of the capillaries.  Dorland's Illustrated Medical Dictionary 650 (31st ed. 2007).

[6]Cellulitis- an acute, diffuse, spreading edematuous, suppurative inflammation of the deep subcutaneous tissues and sometimes muscle, sometimes with abscess formation.  Dorland's Illustrated Medical Dictionary 330 (31st ed. 2007).

Coker suggested that Plaintiff be observed, and that if his condition worsened he should be started on antibiotics.  (Tr. 265).

On March 11, 2008, Plaintiff also had a consultative examination with Dr. Alan Diamond. (Tr. 259-262).  Dr. Diamond noted that Plaintiff had a mild deformity along his left achilles tendon, and a grade zero ankle jerk reflex, at the site of his previous achilles injury.  (Tr. 261).  Plaintiff's lower extremity strength was normal, except for a strength grade of one on his left plantar flexion, and a strength grade of three on his left dosiflexion.  (Tr. 261).  Dr. Diamond noted that blood tests showed that Plaintiff had an elevated white count on admission, and that a urine drug screen showed Plaintiff tested positive for cannabis.  (Tr. 261).  Dr. Diamond noted possible diagnoses of peroneal mononeuropathy from vasculitis[7] or chronic L5 radiculopathy.  (Tr. 262).  Dr. Diamond recommended that MRIs of Plaintiff's cervical and lumbar spine be obtained.  (Tr. 262).  Dr. Diamond further recommended that autoimmune labs be run as well, because Plaintiff's c-reactive protein level was elevated.  (Tr. 262).  Dr. Diamond further noted that a nerve conduction study should be considered, pending on the results of the MRIs and dermatology consult.  (Tr. 262).

An MRI of Plaintiff's lumbar spine was taken on March 11, 2008, and read by Dr. Eric Sale. (Tr. 228, 276-277).  Dr. Sale noted that the MRI revealed a central disc protrusion at the L5/S1 level, which might abut the bilateral S1 nerves without displacement.  (Tr. 228, 277).  The study revealed no canal stenosis or neural foraminal narrowing.  (Tr. 228, 277).

An MRI of Plaintiff's cervical spine was taken on March 11, 2008, and read by Dr. Sale.  (Tr. 229-230, 275-276).  Dr. Sale noted that the MRI revealed multilevel spondylosis, most marked at

---

[7]Vasculitis- inflammation of a blood or lymph vessel.  Dorland's Illustrated Medical Dictionary 2054 (31st ed. 2007).

the C5/C6 level, with a large left paracentral to foraminal hard disc protrusion, which created mild canal stenosis and moderate neural foraminal narrowing.  (Tr. 230, 275).  Dr. Sale noted that the study further revealed small disc protrusions throughout the cervical spine, and bilateral paraspinous muscle edema, which extended from the C4 to the C7 level.  (Tr. 230, 276).

On March 11, 2008, Dr. Kevin St. Clair, of the Ozark Dermatology Clinic, examined the Plaintiff at the Washington Regional Medical Center.  (Tr. 233).  Dr. St. Clair took a punch biopsy of skin from Plaintiff's right shin, and sent it to Northwest Arkansas Pathology Associates for testing.  (Tr. 223).

On March 12, 2008, Dr. William Strimel discharged Plaintiff from the Washington Regional Medical Center.  (Tr. 256-258).  Over the course of his stay, Plaintiff was treated with percocet, toradol, and unaysn.  (Tr. 271).  Dr. Strimel noted that Plaintiff had no significant complications, walked without trouble, tolerated a regular diet, and was discharged with stable vitals.  (Tr. 257). Dr. Strimel noted discharge diagnoses of left lower extremity paresthesias and weakness, bullous skin disease, chronic narcotic dependence, and degenerative disc disease.  (Tr. 256).  Plaintiff was instructed to follow-up with dermatology for his punch biopsy results, and follow-up with Dr. Diamond in two to three weeks.  (Tr. 257).

On March 14, 2008, pathologist Dr. Lizhen Gui, of Northwest Arkansas Pathology Associates, documented the results of the tests run on Plaintiff's punch biopsy.  (Tr. 223).  Dr. Gui noted that the biopsy revealed, "mostly denuded squamous epithlium showing subepidermal blister with minimal neutrophilic vasculitis and minimal inflamation with rare eosinophils.[8]"  (Tr. 223).

---

[8]Eosinophil- a granular leukocyte with a nucleus that usually has two lobes connected by a slender thread of chromatin, and cytoplasm containing coarse, round granules that are uniform in size.  Dorland's Illustrated Medical Dictionary 636 (31st ed. 2007).

Dr. Gui further noted that immunofluorescent studies were negative.  (Tr. 223).

On March 19, 2008, Plaintiff had a follow-up appointment with Dr. St. Clair at the Ozark Dermatology Clinic.  (Tr. 224).  Dr. St. Clair noted that Plaintiff's sores were healing, and no new lesions had arisen.  (Tr. 224).  Dr. St. Clair instructed Plaintiff to compress the sores twice a day, and to use petroleum jelly.  (Tr. 224).

On March 21, 2008, Plaintiff was seen on a walk-in basis by Dr. Diamond at Washington Regional Medical Center Senior Health.  (Tr. 243-244).  Plaintiff first talked to the facility's social worker.  (Tr. 243).  Plaintiff reported he wanted to get off of methadone because he could no longer afford it.  (Tr. 243).  The social worker informed Plaintiff that he should not stop taking his methadone because of possible withdrawal symptoms, and instructed Plaintiff to see his prescribing doctor for help with detoxification.  (Tr. 243).  Plaintiff reported to Dr. Diamond that he was still experiencing numbness on the outside of his left leg that extended down into his great toe.  (Tr. 243).  Dr. Diamond noted that Plaintiff was improving since his stay at the hospital.  In particular, Plaintiff's lower extremity strengths were all normal, except for grade four left foot dorsiflexion.  (Tr. 243).  Dr. Diamond determined that a nerve conduction study was necessary in order to determine whether Plaintiff had isolated mononeuropathy of the peroneal nerve or L5/S1 radiculopathy.  (Tr. 243).  Dr. Diamond was concerned that Plaintiff's symptoms might be caused by an autoimmune disease, noting that a nerve biopsy would be necessary if Plaintiff had new or worsening symptoms.  (Tr. 243).  However, Dr. Diamond opined that an autoimmune disease was not likely, because Plaintiff's punch biopsy results did not show signs of an autoimmune disease, and clinically Plaintiff was improving.  (Tr. 243).  Dr. Diamond further noted, "Given the patients medical problems he would benefit from disability."  (Tr. 243).  Dr. Diamond set up an appointment

-10-

with Plaintiff for April 2, to discuss the results of the nerve conduction study.  (Tr. 243).

In an addendum dated March 24, 2008, to the report dated March 21, 2008, Dr. Diamond noted that he discussed the case with Dr. St. Clair, who did not feel the punch biopsy revealed a potential etiology.  (Tr. 243).  In addition, Dr. Diamond noted that the autoimmune panel on the biopsy did not show any significant results.  (Tr. 244).

On April 2, 2008, Plaintiff was evaluated by Dr. Diamond at Washington Regional Medical Center Senior Health.  (Tr. 241-242).  Plaintiff reported that he was weaning his way off methadone. (Tr. 241).  Plaintiff was supposed to have had a nerve conduction study performed, however he could not afford it.  (Tr. 242).  Plaintiff reported that he recently needed to use his tax return to pay his child support.  (Tr. 242).  Dr. Diamond noted that Plaintiff was slowly improving from a strength and dermatological stand point.  (Tr. 242).  Dr. Diamond also noted that given Plaintiff's improvement, an autoimmune disorder was not likely, but that demyelination[9] should be considered. (Tr. 242).  Dr. Diamond further noted that he talked to Dr. Kaplan about the case, and that Dr. Kaplan suggested that MRIs of Plaintiff's brain and thoracic spine be obtained.  (Tr. 242).  Dr. Diamond instructed Plaintiff to follow-up with him in two months, and referred Plaintiff to Dr. Kaplan, and to Dr. Taylor for pain management.  (Tr. 242).  In addition, Dr. Diamond again noted, "Given the patient's (sic) medical problems he would benefit from disability."  (Tr. 242).

On April 8, 2008, Plaintiff entered the emergency room at the Washington Regional Medical Center, asking for help with methadone detoxification.  (Tr. 253-255).  Plaintiff reported that he was

---

[9]Demyelination- destruction, removal, or loss of the myelin sheath of a nerve or nerves. Dorland's Illustrated Medical Dictionary 493 (31st ed. 2007).

taking methadone for chronic back pain, but had not taken any since Sunday.[10] He stated that he tried to go to a methadone clinic, but could not afford it. (Tr. 253). Plaintiff further reported that he was experiencing chest pains from increased anxiety. (Tr. 253). He stated that his primary care physician had given him Klonopin, but that someone had stolen it. (Tr. 253). Plaintiff was discharged with prescriptions for clonidine and phenergan. (Tr. 255).

An MRI of Plaintiff's brain was taken on May 8, 2008, and read by Dr. Mark E. Moss. (Tr. 245, 250). Dr. Moss noted that the results revealed a normal non-contrasted MRI of the brain. (Tr. 245, 250).

An MRI of Plaintiff's thoracic spine was taken on May 8, 2008, and read by Dr. Moss. (Tr. 246-247, 251-252). Dr. Moss noted that the MRI showed early multilevel degenerative changes most pronounced at the T5-T6 level, with minimal narrowing of the right ventrolateral canal secondary to broad-based shallow disc protrusion. (Tr. 246, 251). Dr. Moss noted that there was no fracture, subluxation, cord compression, or significant canal stenosis. (Tr. 246-247, 251-252). Dr. Moss further noted that the thoracic cord was normal in size and signal. (Tr. 246, 251).

On May 23, 2008, Plaintiff was evaluated as a new patient by Dr. William C. Kendrick. (Tr. 388). Plaintiff reported that he had neck pain and numbness in his left leg, and that he had been out of methadone and hydrocodone for a month. (Tr. 388). Plaintiff explained that a combination of methadone and hydrocodone had been effective in treating his pain in the past. (Tr. 388). Plaintiff reported that he was injured in 2005 in the county jail, and in 2006 by a horse. (Tr. 388). Plaintiff further reported to Dr. Kendrick about his stay at the Washington Regional Medical Center in March. (Tr. 388). Plaintiff stated that he called the emergency room, trying to get prescriptions for pain

_____

[10]The day of the emergency room visit, April 8, 2008, was a Tuesday.

medications, and he was told to get a primary care physician. (Tr. 388). Dr. Kendrick assessed Plaintiff as suffering from neck, leg, and lower back pain. (Tr. 388). Until he got a greater certainty of the legitimacy of the doctor-patient relationship, Dr. Kendrick noted that he was going to prescribe Plaintiff one month of medication. (Tr. 389). Dr. Kendrick instructed Plaintiff to provide him with his medical records from Washington Regional Medical Center. (Tr. 389). Dr. Kendrick provided Plaintiff with prescriptions for methadone and norco. (Tr. 389).

On June 12, 2008, a physical RFC assessment was completed by a non-examining medical consultant, Dr. Jim Takach. (Tr. 347-354). Dr. Takach opined that Plaintiff could frequently lift or carry ten pounds, could occasionally lift and carry twenty pounds, and was unlimited in his ability to push or pull weight within the limits of what he could lift or carry. (Tr. 348). Dr. Takach also determined that Plaintiff could sit, stand, or walk for six hours out of an eight hour workday. (Tr. 348). Dr. Takach further opined that Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, crawl, or reach overhead. (Tr. 349-350). Dr. Takach noted that Plaintiff had no visual, environmental, or communicative limitations. (Tr. 350-351).

On June 20, 2008, Plaintiff saw Dr. Kendrick. (Tr. 387). Plaintiff reported that he was unable to obtain his medical records from Washington Regional Medical Center, because he did not have the sixty dollars needed to get them. (Tr. 387). Plaintiff further reported, however, that he could sign a release and the records could be faxed to Dr. Kendrick for a lesser charge, which Dr. Kendrick instructed Plaintiff to do. (Tr. 387). Plaintiff reported that in addition to his leg and neck pain, he was also experiencing right low back pain, from trying to use his right side more. (Tr. 387). Plaintiff reported that he was taking his medications as instructed, that his medications were effective in controlling his pain, and that he was having no side effects from his medications. (Tr. 387). Dr.

-13-

Kendrick assessed Plaintiff to have lower back pain, and prescribed Plaintiff methadone and norco. (Tr. 387).

On July 17, 2008, Plaintiff saw Dr. Kendrick. (Tr. 386). Plaintiff reported that he was still experiencing chronic neck, left leg, and low back pain. (Tr. 386). Plaintiff further reported that he was taking his medications as instructed, that his medications were effective in controlling his pain, and that he was having no side effects from his medications. (Tr. 386). Dr. Kendrick assessed Plaintiff as suffering from neck, leg, and lower back pain. (Tr. 386). Dr. Kendrick prescribed Plaintiff methadone and norco, and instructed him to return in three months for a follow up appointment. (Tr. 386).

On October 23, 2008, Plaintiff had a consultative Mental Diagnostic Evaluation with Dr. Gene Chambers. (Tr. 360-364). Plaintiff reported that he last worked construction in February of 2008, but had to quit due to neck, leg, and back pain. (Tr. 361). Plaintiff stated that because of his inability to work due to his injuries, he had been homeless for a period of time, and had lost a lot of his possessions that he had acquired while gainfully employed. (Tr. 360). Plaintiff reported that he was currently living in a basement apartment. (Tr. 360). Plaintiff further reported that his father and grandmother had passed away in the last couple of years. (Tr. 360). Plaintiff also reported that his mother was hospitalized for a period of time last year. (Tr. 360). Plaintiff stated that he had increased his smoking since he had fallen on hard times, smoking about fifteen cigarettes a day. (Tr. 361). Plaintiff also stated that he had not drank any alcohol for at least a month, or smoked any marijuana in the past three or four months. (Tr. 361). Plaintiff explained that he no longer drank or used recreational drugs primarily because he could not afford them. (Tr. 361). Plaintiff stated that he was able to manage his own money, and do household chores. (Tr. 363). Plaintiff reported that

-14-

he had been diagnosed with depression by Dr. Magness, who prescribed Plaintiff Celexa.  (Tr. 360).

Dr. Chambers noted a diagnosis of:

> Axis I:  Major depression (single episode);  Alcohol abuse;  Cannabis abuse
> Axis II:  Antisocial personality traits
> Axis III:  Deferred
> Axis IV: Occupational problems, problems related to the social environment
> Axis V:  Global Assessment of Functioning (GAF): 55-65

(Tr. 362-363).  Dr. Chambers further noted that Plaintiff might have some limitations based on his

pain, and the side effects of his pain medications.  (Tr. 363).  Specifically, Dr. Chambers stated that

Plaintiff was not limited from a psychological perspective, but based on pain, might be limited in

the capacity to cope with typical mental/cognitive demands of basic work tasks;  the capacity to

attend and sustain concentration on basic tasks;   the capacity to sustain persistence in completing

tasks;   and the capacity to complete work-like tasks within an acceptable time frame.  (Tr. 363).

On November 15, 2008, Plaintiff saw Dr. Kendrick.  (Tr. 384).  Plaintiff reported that in

addition to his chronic neck, back, and leg pain, he was experiencing back numbness.  (Tr. 384).

Plaintiff further reported that he was taking his medications as instructed, that his medications were

effective in controlling his pain, and that he was having no side effects from his medications.  (Tr.

384).  Dr. Kendrick assessed Plaintiff as suffering from neck, leg, and lower back pain.  (Tr. 384).

Dr. Kendrick prescribed Plaintiff methadone and norco.  (Tr. 384).

On February 4, 2009, Plaintiff saw Dr. Kendrick.  (Tr. 382).  Plaintiff reported that he had

a knot in his back.  (Tr. 382).  Dr. Kendrick noted that Plaintiff had a three centimeter benign fatty

lump on his back, but opined that it was not serious.  (Tr. 382).  Plaintiff reported that he was taking

his medications as instructed, that his medications were effective in controlling his pain, and that he

was having no side effects from his medications.  (Tr. 382).  Dr. Kendrick assessed Plaintiff as

-15-

suffering from neck, leg, and lower back pain. (Tr. 382). Dr. Kendrick prescribed Plaintiff methadone and norco. (Tr. 382).

On February 27, 2009, Plaintiff saw Dr. Kendrick. (Tr. 380). Plaintiff reported that he had his methadone confiscated by the police because he had one hydrocodone pill in the bottle when he was stopped, and he did not have his hydrocodone prescription on him. (Tr. 380). Plaintiff explained that when he got his methadone back from the police, only five of the thirty pills that were confiscated were remaining in the bottle. (Tr. 380). Dr. Kendrick noted that Plaintiff had a refill of methadone, but it could not be filled until March 4. (Tr. 380). Dr. Kendrick also noted that Plaintiff was supposed to have an EKG performed at this visit, but was unable to do so because he did not have enough money put aside. (Tr. 380). Plaintiff reported that he was taking his medications as instructed, that his medications were effective in controlling his pain, and that he was having no side effects from his medications. (Tr. 380). Dr. Kendrick assessed Plaintiff as suffering from neck, leg, and lower back pain. (Tr. 380). Dr. Kendrick gave Plaintiff a prescription for methadone. (Tr. 380).

On April 30, 2009, Plaintiff saw Dr. Kendrick. (Tr. 378). Plaintiff reported that he was taking his medications as instructed, that his medications were effective in controlling his pain, and that he was having no side effects from his medications. (Tr. 378). Dr. Kendrick noted that Plaintiff was getting an EKG that day. (Tr. 378). Dr. Kendrick assessed Plaintiff as suffering from neck, leg, and lower back pain. (Tr. 378). Dr. Kendrick increased Plaintiff's prescription of methadone from 20 mg twice a day to 25 mg twice a day. (Tr. 378). Dr. Kendrick also prescribed Plaintiff norco. (Tr. 378).

On June 2, 2009, Plaintiff saw Dr. Kendrick. (Tr. 377). Plaintiff reported that his girlfriend stole his pain medication. (Tr. 377). Plaintiff explained that he usually locked up his medications,

but his girlfriend took them while he had them out.  (Tr. 377).  Plaintiff stated that the prescription was filled on May 29, 2008, and that the pills were stolen a few days after that.  (Tr. 377).  Dr. Kendrick assessed Plaintiff as suffering from neck, leg, and lower back pain.  (Tr. 377).  Dr. Kendrick warned Plaintiff that the next violation of the narcotics contract would end their doctor-patient relationship, but he gave Plaintiff a prescription of methadone.  (Tr. 377).

On July 28, 2009, Plaintiff saw Dr. Kendrick.  (Tr. 375).  Plaintiff reported that he had suffered a slight fracture to his left ankle.  (Tr. 375).  Plaintiff stated that he went to St. Mary's, where he had a cast put on his ankle, and was given crutches.  (Tr. 375).  Plaintiff stated that he could only tolerate the cast for one month, because walking on crutches had made his back pain worse. (Tr. 375).  Plaintiff reported that he felt like his ankle was healing well.  (Tr. 375).  Plaintiff further reported that he was expecting to be on Medicaid by December, so he could have more tests run at that time.  (Tr. 375).  Plaintiff reported that he was taking his medications as instructed, that his medications were effective in controlling his pain, and that he was having no side effects from his medications.  (Tr. 375).  Dr. Kendrick assessed Plaintiff as suffering from neck, leg, and lower back pain.  (Tr. 375).  Dr. Kendrick prescribed Plaintiff methadone and norco.  (Tr. 375).

On October 22, 2009, Plaintiff saw Dr. Kendrick.  (Tr. 373).  Plaintiff reported that his disability hearing was in six days.  (Tr. 373).  Plaintiff further reported that he was taking his medications as instructed, and that he was having no side effects from his medications.  (Tr. 373).  However, Plaintiff also stated that his norco was not helping his breakthrough pain.  (Tr. 373).  Dr. Kendrick assessed Plaintiff as suffering from neck, leg, and lower back pain.  (Tr. 373).  Dr. Kendrick prescribed Plaintiff methadone and norco.  (Tr. 373).

At his hearing before the ALJ on October 28, 2009, Plaintiff testified that his pain was the

-17-

worst when he was standing.  (Tr. 60).  Plaintiff testified that he also experienced back pain while

sitting.  (Tr. 60).  He explained that depending upon the type of chair he was sitting on, he could

maybe sit for twenty to thirty minutes at a time.  (Tr. 66).  Plaintiff stated that walking actually

helped his pain.  (Tr. 53).  He explained that laying down and doing nothing could "...almost be

worse than walking."  (Tr. 65).  Plaintiff testified that the medications he was taking helped him

walk, as long as he did not over do it.  (Tr. 59).  Plaintiff further testified that he walked everywhere

he went, but sometimes took a bus.  (Tr. 53).  Plaintiff explained that he could no longer ride a bike.

(Tr. 53).  Plaintiff stated that he had been doing some volunteer work at churches, cleaning up and

servings meals.  (Tr. 53).  Near the close of the hearing, Plaintiff stated he needed to get up and

stretch his back.  (Tr.77).  Plaintiff explained that the forty-five to fifty minutes they had been sitting

was too much for him.  (Tr. 78).

At the hearing, Plaintiff also testified that he had a child support payment of 166 dollars a

week which he was struggling to make.  (Tr. 42).  He also testified that he was arrested in 2009 on

charges relating to marijuana.  (Tr. 51).  Plaintiff explained that he was assessed 280 dollars in fines

and sentenced to seventy-five days in jail.  (Tr. 51).  He was given credit for eight days time served,

and had the remaining sixty-seven days suspended.  (Tr. 51).  Plaintiff stated that he had not smoked

marijuana in six weeks, because if he got caught with it again, it could be a major charge, and not

just some minor fines.  (Tr. 51-52).  Plaintiff also testified that he was still smoking a half a pack of

cigarettes a day.  (Tr. 52).

## III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by

substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir.

-18-

2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742,747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and prevents him from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairments" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § § 423(d)(3), 1382(3)(c).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing his claim;  (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments;  (3) whether the impairment(s) meet or equal an

impairment in the listings;  (4) whether the impairment(s) prevent the claimant from doing past relevant work;  and (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. § 404.1520.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity.  See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. § 404.1520.

## IV.   Discussion:

Plaintiff contends that the ALJ erred in concluding that he was not disabled during the relevant time period.  Defendant argues substantial evidence supports the ALJ's determination.

### A.   Plaintiff's Impairments

The ALJ found that Plaintiff had the following severe impairments:  a back disorder (degenerative disc disease), a tendon disorder, and left leg neuropathy.  However, the ALJ found that Plaintiff's depression, alcohol abuse, and cannabis abuse were not severe.  (Tr. 13).  The ALJ noted that Dr. Chambers found that Plaintiff had a GAF score of 55-65.  (Tr. 13).  The ALJ stated that this was indicative of only mild to moderate limitations.  (Tr. 13).  Plaintiff contends that the ALJ erred by making a medical decision when he interpreted the GAF score.  The ALJ's characterization of Plaintiff's GAF score as indicative of only mild to moderate limitations is consistent with the definition contained in the Diagnostic and Statistical Manual of Mental Disorders.  See Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000).  The ALJ did not assign Plaintiff a GAF score, Dr. Chambers did.  The ALJ merely took the score at face value, and decided that Plaintiff's mental impairments were not severe.  This decision was consistent with Dr. Chambers assessment that Plaintiff was not limited from a psychological perspective, but might possibly be

-20-

limited because of pain.  (Tr. 363).  Additionally, Plaintiff did not allege any mental impairments in his application.  (Tr.167).  Failure to allege an impairment in the application for disability weighs against the finding of that impairment as a severe impairment.  See Partee v. Astrue, 638 F.3d 860, 864 (8th Cir. 2011);  Smith v. Shalala, 987 F.2d 1371, 1375 (8th Cir.1993).  Accordingly, the Court finds Plaintiff's argument to be without merit.

The ALJ  further found that Plaintiff did not have impairments that met or medically equaled a listed impairment.  The ALJ considered the listed impairments related to loss of function of the musculoskeletal system, persistent disorganization of motor function, and peripheral neuropathies, found in sections 1.00(B) and 11.00(C), and listing 11.14, and concluded that Plaintiff's severe impairments were not of such a severity, either singly or in combination, to meet one of the listed impairments.  Considering the record as a whole, and reviewing sections 1.00(B) and 11.00(C), and listing 11.14, the Court believes there is substantial evidence to support the ALJ's conclusion that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.

### B.    Subjective Complaints and Credibility Analysis:

The Court now turns to the ALJ's evaluation of Plaintiff's subjective complaints.  The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to:  (1) Plaintiff's daily activities;  (2) the duration, frequency, and intensity of his pain;  (3) precipitating and aggravating factors;  (4) dosage, effectiveness, and side effects of his medications; and  (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may

discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the United

States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's]

credibility is primarily a matter for the ALJ to decide."  Edwards v. Barnhart, 314 F.3d 964, 966 (8th

Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly evaluated

Plaintiff's subjective complaints.  Although Plaintiff contends that his impairments were disabling

during the relevant time period, the evidence of record does not support this conclusion.

In the present case, the ALJ found that Plaintiff's statements concerning the intensity,

persistence, and limiting effects of his symptoms were not credible, to the extent that they were

inconsistent with the RFC.  (Tr. 14-15).  Specifically the ALJ noted that:

> The claimant has a significant history of drug seeking behavior and medical evidence
> indicates abuse of prescription and non-prescription drugs as well as alcohol.  No surgical
> treatment of the claimant's neck back, or leg condition has been recommended.  He has
> shown some positive response to the treatment he has received.  The severity and persistence
> of symptoms alleged by the claimant are not supported by the medical evidence.

(Tr. 16-17).  Plaintiff tested positive for, and admitted to smoking marijuana.  (Tr. 51-52, 261, 361).

Further, Dr. Coker noted that Plaintiff had track marks consistent with IV drug use.  (Tr. 361).  The

record reflects that on numerous occasions, Plaintiff entered the emergency room complaining of a

pain level of ten and left with prescriptions for pain medications.  On two occasions, Plaintiff

reported to Dr. Kendrick that his methadone had been stolen, and asked for a new prescription.  (Tr.

377, 380).  These incidents led to Dr. Kendrick warning Plaintiff that another violation of their

narcotics contract would end their doctor-patient relationship.  (Tr. 377).  "A claimant's misuse of

medications is a valid factor in an ALJ's credibility determinations."  Anderson v. Barnhart, 344 F.3d

809, 815 (8th Cir. 2003).  The United States Court of Appeals for the Eighth Circuit has found that

drug seeking behavior "...tend[s] to vitiate...claims of disability by casting a cloud of doubt over the legitimacy of...numerous trips to the hospital." Anderson v. Shalala, 51 F.3d 777, 780 (8th Cir. 1995).  In addition, Plaintiff consistently reported to reported to Dr. Kendrick that his medication was effective in relieving his pain, and that he was not having any side effects.  (Tr. 375-387).  Only six days before his administrative hearing in October 2009, did Plaintiff first report that his pain medication was not effective.  (Tr. 373).  However, Plaintiff testified at the hearing that his medications helped him walk.  (Tr. 59).  The ability to manage pain through the use of pain medication is inconsistent with a disabling level of pain.  Moore v. Astrue, 572 F.3d 520, 524-525 (8th Cir. 2009); citing Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir.1997) (concluding that, if an impairment can be controlled through treatment or medication, it cannot be considered disabling).

Further, Plaintiff reported that he was able to carry out extensive activities of daily living. In a function report dated May 20, 2008, Plaintiff reported that he prepared his own meals everyday, but only did the dishes when asked to do so.  (Tr. 182).  Plaintiff reported, without explaining or elaborating, that he did not do house or yard work either because he could not, or did not feel like doing it.  (Tr. 183).  However, Plaintiff reported to Dr. Chambers during his mental evaluation, that he could do his household chores.  (Tr. 363).  Plaintiff also reported to Dr. Chambers that he does his own shopping, and manages his own money.  (Tr. 363).  In the function report, Plaintiff reported that he had no trouble getting around town without assistance to go visit with friends.  (Tr. 183-184). Plaintiff explained that he used public transportation to get around.  (Tr. 183).  In addition, Plaintiff testified at the hearing before the ALJ that he did volunteer work at a local church cleaning up and serving food.  (Tr. 53).  This level of activity belies Plaintiff's complaints of pain and limitation, and the Eight Circuit has consistently held that the ability to perform such activities contradicts a

Plaintiff's subjective allegations of disabling pain.  See Hutton v. Apfel, 175 F.3d 651, 654-655 (8th Cir. 1999) (holding ALJ's rejection of claimants application was supported by substantial evidence where daily activities -making breakfast, washing dishes and clothes, visiting friends, watching television and driving -were inconsistent with claim of total disability).

Additionally, Plaintiff's testimony as to his physical abilities was inconsistent.   In the function report, Plaintiff reported that he could walk for only one-half of a mile before needing a fifteen minute break.  (Tr. 185).   In addition, Plaintiff reported that he could only sit for one to two minutes without experiencing pain.  (Tr. 178).   However at the hearing before the ALJ, Plaintiff testified that he walked everywhere he went, stating that walking helped relieve his pain.  (Tr. 53). Plaintiff explained that walking caused him less pain than laying around.  (Tr. 65).  At the hearing, Plaintiff first stated he could sit for twenty to thirty minutes without pain.  (Tr. 66).  At the close of the hearing, Plaintiff stated he needed to get up and stretch his back.  (Tr.77).  He explained that the forty-five to fifty minutes they had been sitting during the hearing was too much for him.  (Tr. 78).

Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

### C.    RFC Assessment:

The Court next turns to the ALJ's assessment of Plaintiff's RFC. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record.  Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005);  Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. §

404.1545(a)(3).   The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question."  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Therefore an "ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In the present case, the ALJ considered the medical assessments of the examining agency's medical consultants, the reports of non-examining medical consultants, Plaintiff's subjective complaints, and Plaintiff's medical records. He determined that Plaintiff could perform sedentary work, except that:

> The claimant cannot climb ladders, scaffolds, or ropes or engage in the sustained operation of motor vehicles as part of his work. The claimant cannot work overhead bilaterally. The claimant should not be exposed to unprotected heights, dangerous equipment/machinery, extreme wet conditions, or vibration. The claimant must avoid walking on uneven surfaces. The claimant can occasionally climb ramps or stairs, stoop, bend, crouch, crawl, kneel, or balance. Due to pain and side effects of medication, the claimant must work where instructions are simple and non-complex;  interpersonal contact with co-workers and the public is superficial and incidental to the work performed;  the complexity of tasks is learned by rote;  the work is routine and repetitive;  there are few variables;  little judgment is required;  and the supervision required is simple, direct, and concrete.

(Tr. 14).  In making the RFC determination, the ALJ noted Plaintiff's multiple emergency room visits for leg, neck, and back pain, and the records from Dr. Diamond and Dr. Kendrick.  The ALJ specifically discredited Dr. Diamond's statement that the Plaintiff would benefit from being on disability.  (Tr. 16).  It is true that "[a] treating physician's opinion is generally given controlling weight,  but is not inherently entitled to it." Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006); See 20 C.F.R. § 404.1527(d)(2).  "A medical source opinion that an applicant is 'disabled' or 'unable

to work,'... involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Dr. Diamond's statement does not represent a medical opinion. He provided no justification for the statement, and did not explain or list any specific physical restrictions that Plaintiff had. In fact as the ALJ noted, on one occasion when Dr. Diamond made this note, he discussed Plaintiff's inability to afford a proper medical work-up. Dr. Diamond's statement was a conclulsory opinion on the ultimate determination of disability, and conclusory statements will not support a finding of a disability. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003).

Based upon the suggestions from the consultative examination of psychologist Dr. Chambers, the ALJ included limitations in the RFC based on Plaintiff's pain and side effects from pain medications. Plaintiff contends that the ALJ's RFC determination did not properly address the findings of Dr. Chambers, and that Plaintiff is more severely limited by pain than stated in the RFC. Dr. Chambers stated that Plaintiff might be limited by pain in the capacity to cope with typical mental/cognitive demands of basic work tasks; the capacity to attend and sustain concentration on basic tasks; the capacity to sustain persistence in completing tasks; and the capacity to complete work-like tasks within an acceptable time frame. (Tr. 363). Dr. Chambers noted that Plaintiff had "...the capacity from a psychological perspective, but may have limitations based on pain and how it affects him." (Tr. 363). Dr. Chambers also noted that Plaintiff "...might also have limitations based on pain medication and the slowing of his mental process." (Tr. 363). These statements do not represent a hard medical finding of a limitation. Rather, they represent a suggestion of how the Plaintiff might be limited. Dr. Chambers is trained to evaluate patients from a psychological perspective, and he noted that Plaintiff was not limited in that regard. Dr. Chambers' suggestions

are also inconsistent with the record as a whole.  As discussed above, the ALJ properly discredited

Plaintiff's subjective complaints of pain due to his history of drug seeking behavior.  In addition,

Plaintiff on numerous occasions subsequent to his evaluation by Dr. Chambers, reported to Dr.

Kendrick that his medication was effective at controlling his pain, and did not give him any adverse

side effects.

Finally, a review of the medical evidence in the record does not indicate that Plaintiff's

examining physicians placed any restrictions on his activities that would preclude him from

performing the RFC determined.  See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (lack of

physician-imposed restrictions militates against a finding of total disability).  Based on the record

as a whole, the Court finds substantial evidence to support the ALJ's RFC determination.

### D.    Hypothetical Question to the Vocational Expert:

The Court finally looks to the ALJ's determination that Plaintiff could perform substantial

gainful employment within the national economy.  In making this determination, the ALJ posed a

series of hypotheticals to VE David O'Neal.  First, the ALJ relayed the following on the record:

> [T]he Judge finds that based upon the combination of impairments objectively supported he
> should perform no work greater than the sedentary level.  He also needs to avoid uneven
> walking surfaces.  And shouldn't work overhead.  There should be no sustained driving.....
> No climbing of scaffolds, ladders or ropes taking into consideration the problems with the
> lower extremities, as well as his pain level.  No work at unprotected heights, around
> dangerous equipment or machinery.  He needs to avoid the extremes of wetness as well as
> vibration.  And he can do no more than occasionally climb ramps and stairs, stoop, bend,
> crouch, crawl, kneel, or balance....  Additionally, secondary to his level of pain, side effects
> of medication, poor sleep, the work should be noncomplex, simple instructions, little
> judgment.  Work of a routine, repetitive nature....  Learn by rote.  Few variables.  Superficial
> contact incidental to work with the public and coworkers.  And supervision, which is
> concrete, direct and specific.

(Tr. 69-71).   The ALJ then asked the VE if a person with this RFC would be able to do the

-27-

claimant's past relevant work.[11]  (Tr. 71).  The VE stated that the hypothetical individual would not.

(Tr. 71).  However, the VE testified that a hypothetical individual with the stated RFC, Plaintiff's

age, and education could perform work in the national economy.  (Tr. 72).  The VE provided

examples of a production worker, an inspector, and an assembler.[12]  (Tr. 72-74).  Additionally, the

VE testified that restrictions of extra breaks, being off pace, or needing extra days off would each

individually eliminate all available jobs to the hypothetical individual.  (Tr. 74-75).

Plaintiff contends that the ALJ did not fully set forth all of his impairments in the

hypothetical to the VE.  Specifically, Plaintiff takes issue with the ALJ decision not to include all

of Dr. Chambers suggested limitations based on his pain and side effects from pain medication.

However, as discussed above the ALJ properly excluded those limitations from the RFC, because

they are inconsistent with the record as a whole, and only represent suggestions, not hard and fast

limitations.

The Court finds that the hypothetical the ALJ posed to the VE fully set forth the impairments

which the ALJ accepted as true and which were supported by the record as a whole.  See Howe v.

Astrue, 499 F.3d 835, 842 (8th Cir. 2007);  Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).

Accordingly, the Court finds that the VE's testimony constitutes substantial evidence supporting the

---

[11]At the hearing Plaintiff's past relevant work was determined to be work as a landscape laborer, Dictionary of Occupational Titles (DOT) # 408.687-014, a laundry worker, (hospital cleaner) DOT # 323.687-010, and a janitor, DOT # 381.687-014.  (Tr. 45-46).  Subsequent to the hearing, ALJ Neel listed Plaintiff's past relevant work in his written opinion as auto mechanic, DOT # 620.684-014, a production laborer, DOT # 921.683-050, and construction laborer, DOT # 869.664-014,.  (Tr. 17).  These are all jobs performed at a heavy or medium level, which Plaintiff reported in his filing and testified at the hearing, that he did as cash jobs under the table.

[12]Production worker, (button sticker) DOT # 734.687-090;  inspector, (bead inspector) DOT # 725.687-010;  assembler, (fishing-reel assembler) DOT # 732.684-062.

-28-

ALJ's conclusion that Plaintiff was not disabled, as he was able to perform work in the national economy as a production worker, an inspector, and an assembler.  See Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

## V.    Conclusion:

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying Plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that Plaintiff's complaint should be dismissed with prejudice.

DATED this 24th day of August 2011.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE